**Royce Dean ARMSTRONG, Appellant,**

v.

**Mary Jane ARMSTRONG, Appellee.**

**No. 1999–CA–002970–MR.**

Court of Appeals of Kentucky.

Dec. 15, 2000.

---

4. Rules of the Supreme Court.

Rodney Burress, Shepherdsville, KY, for Appellant.

Norman R. Lemme, Shepherdsville, KY, for Appellee.

Before BUCKINGHAM, GUIDUGLI, and HUDDLESTON, Judges.

## OPINION

BUCKINGHAM, Judge:

Royce Dean Armstrong appeals from an order of the Bullitt Circuit Court dividing his pension plan with his ex-wife, Mary Jane Armstrong, pursuant to their divorce decree. Having considered the arguments of counsel and the applicable law, we reverse and remand.

Royce and Mary were married in 1958, and Royce became employed by Jim Beam Brands Company on October 22, 1959. After having been married almost 34 years, they were divorced by a decree of dissolution of marriage entered in the Bullitt Circuit Court on May 14, 1992. That decree contained a provision which provided "[a] Qualified Domestic Relations Order shall issue dividing equally the parties['] interest in Petitioner's pension from the date of marriage to date of dissolution." Royce's pension plan was a defined benefit plan based on service credits earned and the date of his retirement.

No attempt was made by either party to have the court enter a Qualified Domestic Relations Order (QDRO) until Mary's attorney filed a motion in November 1998. Over Royce's objection, the trial court entered such an order on November 30, 1998.

In early December 1998, Royce moved the trial court to set aside the QDRO on the ground that it failed to equally divide his pension from the date of marriage to the date of dissolution as required by the decree. The motion was heard before a domestic relations commissioner, and both the commissioner and the trial court determined that the terms of the QDRO were proper and should not be set aside. Upon entry of the trial court's order so holding, this appeal followed.

The QDRO contained the following provision which determined the method for dividing Royce's pension:

At such time as specified in Paragraph 7 of this Order, the Plan shall pay to the Alternate Payee one half of the fraction wherein the numerator is the number of months the Participant was under the Plan during the marriage of the parties from July 18, 1958 until May 14, 1992, and the denominator is the number of total months the Participant was under the Plan of the dollar amount of each monthly payment otherwise to be paid to the Participant.

The QDRO provided the use of a "coverture fraction" in determining the division of the pension. The formula used has been explained as follows:

The "time rule" formula includes a marital fraction, sometimes referred to as a "coverture fraction," which determines the marital interest in the pensions. The marital fraction consists of the numerator which is the number of years (or months if more accurate) that the employee spouse has earned towards the pension during the marriage, over the denominator, which is the number of years (or months if more accurate) of total service towards the pension. The marital fraction is multiplied times the monthly benefit and divided in half (in order to divide the marital portion of the pension benefits). At the time the court establishes the percentage, the benefit is an unknown figure. Therefore, actual calculation of a dollar amount must await receipt of benefits.

*In re the Marriage of Hunt,* 909 P.2d 525, 530–31 (Colo.1995).

Royce was born on June 9, 1935, making him nearly 57 years old when the decree was entered in May 1992. He had qualified for early retirement, and would have been entitled to receive benefits had he retired when the decree was entered. Under the terms of the pension plan, Royce may retire with normal benefits at age 65. From the time Royce and Mary were married in 1959 until they were divorced in 1992, Royce was employed by Jim Beam Brands for 392 months. At the time the QDRO was entered by the court, Royce continued to remain so employed. Mary's interest in Royce's pension would have been computed under the QDRO whenever Royce's payments are to commence by applying the following formula:

$$\frac{\text{number of months employed while married to Mary}}{\text{total number of months employed}} \times \text{amount of monthly benefit} \times 50\% = \text{Mary's share}$$

■ The three methods used by courts in dividing pension plans in a divorce case are the net present value method, the deferred distribution method, and the reserve jurisdiction method. *Hunt,* 909 P.2d at 530–31. The net present value method results in the non-employee spouse receiving a lump sum to be distributed immediately. *Id.* at 531. It has also been referred to as the "immediate offset" method because the lump sum may be offset by the value of other marital property. *Id.* This method is frequently used when the value of the pension is low because the employee spouse has worked for his or her employer for only a few years or because the job is a low paying one. *Id.*

■ In the deferred distribution method, the court predetermines the percentage of the pension income that the non-employee spouse will be eligible to receive once the pension is vested and matured. *Id.* The marital interest of the non-employee spouse is distributed in ac-

cordance with that percentage at a later date.[1] In the reserve jurisdiction method, the percentage of the pension income to be received by the non-employee spouse is determined later when the pension has vested and matured. *Id.* Although the trial court in this case did not phrase its determination as such, it chose to use the reserve jurisdiction method of delaying the distribution of Mary's interest. In so doing, the trial court directed that the "time rule" formula, which we described above, be employed.

The use of the "time rule" formula has been approved by the courts in a number of states. *See Cooper v. Cooper,* 167 Ariz. 482, 808 P.2d 1234 (1990), *review denied,* (Ariz. May 7, 1991); *Stouffer v. Stouffer,* 10 Haw.App. 267, 867 P.2d 226 (1994); *Warner v. Warner,* 651 So.2d 1339 (La. 1995); *Lynch v. Lynch,* 665 S.W.2d 20 (Mo.App.1983); *Rolfe v. Rolfe,* 234 Mont. 294, 766 P.2d 223 (1988); *Gemma v. Gemma,* 105 Nev. 458, 778 P.2d 429 (1989); *Berry v. Meadows,* 103 N.M. 761, 713 P.2d 1017 (1986); *Welder v. Welder,* 520 N.W.2d 813 (N.D.1994); *Woodward v. Woodward,* 656 P.2d 431 (Utah 1982). The Colorado court in *Hunt* aptly set forth many sound reasons supporting the use of that formula.[2]

The *Hunt* court noted that the "marital foundation" theory underlies the "time rule" formula. *Id.* at 534. The "marital foundation" theory is that "[t]he employee spouse's ability to enhance the future benefit after the marriage frequently builds on foundation work and efforts undertaken during the marriage." *Id.* The Nevada Supreme Court described the premise behind the "marital foundation" theory as "early working periods are the building blocks to upward mobility and hopefully an increased salary." *Gemma,* 778 P.2d at 431.

Royce argues that the QDRO entered by the trial court awarded Mary a portion of his separate nonmarital property in the form of his post-marital contributions to the pension plan. He specifically asserts that the decree provided that the parties' interest in his pension be equally divided "from the date of marriage to date of dissolution" and that the method employed by the trial court in dividing his pension was contrary to the decree since it included contributions made by him following the decree's entry.[3]

 There is no Kentucky case directly on point. It is clear, however, that pension and profit sharing plans should be valued on the date of the divorce decree. *Clark v. Clark,* Ky.App., 782 S.W.2d 56, 62 (1990). Also, we are mindful that a settlement of the property rights of parties "should be finalized as much as possible at the time of the divorce." *Light v. Light,* Ky.App., 599 S.W.2d 476, 479 (1980). Furthermore, "[i]t is the pension, not the benefits, which is the marital asset which is divided by the court." *Brosick v. Brosick,* Ky.App., 974 S.W.2d 498, 503 (1998). More importantly, a non-employee spouse "is not entitled to share in any pension benefits earned after divorce and before retirement[.]" *Foster,* 589 S.W.2d at 225.

Although Royce urges us to reject the use of the coverture fraction by the trial court and to require the trial court to "spell out a specific sum to be paid to Mary Armstrong upon his retirement," we decline to do so. We again note that it is the pension that is to be divided and not merely the pension benefits. *Brosick,* 974 S.W.2d at 503. In *Light, supra,* this court

---

1. The deferred distribution method was used by the court in *Foster v. Foster,* Ky.App., 589 S.W.2d 223, 224 (1979).

2. *See also* Graham & Keller, *15 Kentucky Practice Domestic Relations Law,* § 15.29, pp. 536–541 (2d ed.1997), and the 2000 pocket part, for a further discussion of the merits of using the "time rule" formula and applying the employee's salary at retirement rather than the salary at the time of the divorce.

3. Royce's pension plan was a defined benefit plan, and he actually made no contributions to it.

held that "[t]he value of a pension, if any[,] should therefore be marital property for the portion accrued during coverture." *Id.* at 478. In *Poe v. Poe,* Ky.App., 711 S.W.2d 849 (1986), this court approved the use of a formula that used the fraction in dividing the marital pensions. *Id.* at 851, 857. In *Carranza v. Carranza,* Ky.App., 765 S.W.2d 32 (1989), the court again approved the use of the formula and fraction. *Id.* at 34.

The real issue that must be addressed is not whether the coverture fraction should be used but whether Royce's salary at the time of the divorce decree or his salary upon which his benefits will ultimately be based should be used in determining Mary's interest under the formula. In *Poe,* the salary at the time of the divorce decree was used. *Id.* at 851. That formula was again approved in the *Carranza* case. *Id.* at 34. Likewise, this court in *Light,* 599 S.W.2d 476, stated its approval of a formula that employed the salary at the time of the decree. *Id.* at 479. This view has been referred to as the "bright line" rule "which likens post-divorce pension enhancements to post-divorce earnings and characterizes all such increases as the separate property of the employee spouse." *Hunt,* 909 P.2d at 532.

Although the reasons stated by the Colorado court in *Hunt* and by courts in cases from other jurisdictions for adopting the "time rule" formula and the "marital foundation theory" have some merit, we nevertheless opt to follow prior precedent from this court.[4] We recognize that "a trial court retains broad discretion in valuing pension rights and dividing them between parties in a divorce proceeding, so long as it does not abuse its discretion in so doing in the sense that the evidence supports its findings and they thus are not clearly erroneous." *Duncan v. Duncan,* Ky.App., 724 S.W.2d 231, 234–35 (1987). However, by failing to follow applicable precedent, the trial court abused its discretion.[5]

Therefore, the order of the Bullitt Circuit Court is reversed, and the case is remanded for determination of Mary's interest in Royce's pension plan in accordance with this opinion.

ALL CONCUR.

---

4. A number of jurisdictions have held that the employee's salary at the time of the divorce should be used. *See Koelsch v. Koelsch,* 148 Ariz. 176, 713 P.2d 1234 (1986); *Shill v. Shill,* 115 Idaho 115, 765 P.2d 140 (1988); *Berrington v. Berrington,* 534 Pa. 393, 633 A.2d 589 (1993); *Berry v. Berry,* 647 S.W.2d 945 (Tex.1983).

5. *See* Rules of the Supreme Court (SCR) 1.040(5).